IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

THEODORE BRYANT,

*Plaintiff*,

v.

Civil Action No. ELH-18-1183

KEVEN K. McALEENAN,

*Defendant*.

## MEMORANDUM OPINION

Theodore Bryant, the self-represented plaintiff, lodged an employment discrimination action in April 2018 against Kirstjen Nielsen, then the Secretary of the Department of Homeland Security ("DHS"). ECF 1 (the "Complaint"). Keven K. McAleenan, Acting Secretary of DHS, has since been substituted as the defendant, as Nielsen no longer serves as Secretary of DHS. *See* ECF 22.

Plaintiff, who is African-American, is employed by the Transportation Security Administration ("TSA"), a DHS agency, as a Transportation Security Officer ("TSO"), or security screener, at the Baltimore Washington International Thurgood Marshall Airport ("BWI"). ECF 1 at 7; ECF 16-2 (Plaintiff's Affidavit) at 2. He alleges retaliation in response to multiple grievances that he filed. And, he claims that he was subjected to race discrimination in the form of a hostile work environment. ECF 1 at 7.

Suit is predicated on the Notification and Federal Employee Antidiscrimination and Retaliation Act of 2002, 5 U.S.C. §§ 2301 *et seq.* (the "No Fear Act"), and Title VII of the Civil

Rights Act of 1964, as amended, 42 U.S.C. §§ 2000e *et seq.* ("Title VII"). Plaintiff appended

several exhibits to the Complaint. ECF 1-2 – ECF 1-10.[1]

Defendant has moved to dismiss under Fed. R. Civ. P. 12(b)(6) or, in the alternative, for

summary judgment under Fed. R. Civ. P. 56(a). ECF 16. The motion is supported by a

memorandum of law (ECF 16-1) (collectively, the "Motion") and numerous exhibits. ECF 16-2

– ECF 16-17. Plaintiff opposes the Motion (ECF 18), supported by exhibits. ECF 18-1 – ECF 18-

3. Defendant has not replied, and the time to do so has expired. *See* Local Rule 105.2(a).

No hearing is necessary to resolve the Motion. *See* Local Rule 105.6. I shall construe the

Motion as one to dismiss with respect to the No Fear Act claim, and as one for summary judgment

with regard to the Title VII claims. And, for the reasons that follow, I shall grant the Motion.

ECF 16.

## I. Factual and Procedural Background

### A. Screener Employment Standards

As noted, Bryant is employed by the TSA as a TSO, or security screener, at BWI. ECF

16-2 at 2. Minimum employment standards for security screeners are codified in the Aviation and

Transportation Security Act, 49 U.S.C. § 44935 ("ATSA"). The ATSA requires that security

screeners possess, *inter alia*, "basic aptitudes and physical abilities, including color perception,

visual and aural acuity, physical coordination, and motor skills[.]" *Id*. § 44935(f)(1)(B). Further,

"[s]creeners operating screening equipment shall be able to distinguish on the screening equipment

monitor the appropriate imaging standard specified by the Administrator [of the TSA]." *Id*.

§ 44935(f)(1)(B)(i).

---

[1] The Court may consider exhibits attached to and incorporated in the complaint. *Phillips v. LCI Int'l, Inc.*, 190 F.3d 609, 618 (4th Cir. 1999).

TSA Management Directive No. 11000.33-1, effective October 28, 2010 (ECF 16-3, the "Directive"), provides "TSA policy and procedures for implementing the statutory requirement that TSOs demonstrate daily fitness for duty," pursuant to 49 U.S.C. § 114(m). The Directive defines "Fit for Duty" as a "statutory requirement which mandates that a TSO cannot have illegal drugs or alcohol present in his or her system and is not impaired while on duty due to sleep deprivation, medication, or failure to take prescription medicine as directed." ECF 16-3 at 1. And, the Directive defines "Daily Demonstration" as a requirement that TSOs "demonstrate their fitness for duty on a daily basis." *Id*. According to the Directive, "[t]his daily demonstration will be accomplished by Start-of-Shift Observations and supervisory observations over the course of the work shift." *Id*.

The Directive states, in relevant part, that TSOs, such as plaintiff, are responsible for the following duties, *id*. at 2:

(1) Reporting to work every shift for duty, ready and able to meet their work obligations; and
(2) Informing his or her supervisor if he or she is impaired and therefore, unfit for duty.

And, "TSA Management officers" are responsible for the following, *id*.:

(1) Ensuring that employees under their supervision are aware of, and adhere to, the guidance set forth herein;
(2) Ensuring that the TSOs are fit for duty at the beginning of, and throughout, each shift; and
(3) Considering fitness for duty requirements when preparing and managing work schedules, shifts, and breaks.

Further, the Directive provides that management officials "shall assess TSO daily fitness for duty within 30 minutes of the start of each TSO's work shift." *Id*. at 3. This is referred to as the "Start-of-Shift Observation." *Id*. During the Start-of-Shift Observation, and over the course of the shift, management officials, and in some cases, Lead Transportation Security Officers

("LTSOs"), "will observe each TSO for signs of fatigue, impairment, sluggishness, and/or glassy eyes." *Id.*

According to the Directive, "a TSO who reports for work unfit for duty may be placed on absence without leave (AWOL) status[.]" *Id.* And, if a TSO is repeatedly found to be unfit for duty, the officer "shall be notified in writing of that determination and may be subject to discipline," in accordance with TSA Management Directive No. 1100.75-3 (ECF 16-4, "TSA Handbook"). ECF 16-3 at 3.

With respect to a TSO who is impaired due to sleep deprivation, medication, and/or the failure to take prescription medication as directed, the Directive outlines the following procedures, *id.* at 3:

> (1) If a management official has a reasonable belief a TSO is not fit for duty, or if the TSO discloses that he or she has a fitness for duty impairment and his/her supervisor concurs, the management official may offer the TSO an opportunity to recover, e.g., taking a short break to address his/her condition.
>
> (2) If the TSO is unable to address his/her physical impairment, the supervisor may permit the affected employee to request leave . . . . If the TSO does not have a sufficient leave balance, he or she may request leave without pay (LWOP).
>
> > (a) A TSO who is not fit for duty is responsible for requesting appropriate leave, e.g.,, [sic] annual leave, sick leave, compensatory time off, if available, or LWOP following established procedures for requesting unscheduled leave.
> >
> > (b) If the TSO fails to follow established procedures for requesting unscheduled leave under these circumstances, he/she will be placed in an AWOL status for the remainder of the workday.
> >
> > **NOTE:** Before an employee is placed in an AWOL status, concurrence may be obtained from HQ [Employee Relations ("ER")] and/or field counsel.
>
> (3) TSOs who repeatedly fail to demonstrate fitness for duty must be notified in writing that future instances of reporting not fit for duty will be charged as AWOL.

(a) While not itself a disciplinary action, AWOL is a basis for discipline as outlined in [the TSA Handbook].

(b) A TSO charged as AWOL or repeatedly reporting not fit for duty may be subject to disciplinary action.

(c) Management officials will consult with an ER Specialist and/or field counsel for guidance regarding disciplinary actions as a result of AWOL charges and/or failure to demonstrate fitness for duty.

(4) Based on the nature and extent of the TSO's condition, adjustments or modifications to the TSO's duties and/or schedule may be explored . . . , if applicable.

Of relevance here, Section L of the TSA Handbook, titled "Workplace Violence," provides, in pertinent part, ECF 16-4 at 14-15:

> Violent, threatening, intimidating, or confrontational behavior is unacceptable and will not be tolerated. Threatening behavior may include harassment, intimidation, or any oral and/or written remarks or gestures that communicate a direct or indirect threat of physical harm, or which otherwise frighten or cause an individual concern for his or her personal safety. Such irresponsible and inappropriate behavior includes actions, gestures, language or any other intimidating or abusive action that creates a reasonable apprehension of harm. Employees, supervisors, and managers are responsible for enforcing the highest standards of personal safety and welfare at the workplace. Employees must immediately report threats of violence, violent incidents or other inappropriate behavior to their supervisors, Workplace Violence Coordinators, TSA Worksite Managers, or any TSA management official, as appropriate in the situation.

## B.      The Evidence

On May 11, 2013, Bryant met with David Marzola, Assistant Federal Security Director ("FSD") at TSA, who is Caucasian, and Jimmy Briseno, a Deputy Assistant FSD, who is Hispanic, to discuss plaintiff's screening of checked bags. ECF 1 at 7; ECF 16-2 at 3; ECF 16-5 (Plaintiff Notes, dated May 10, 2013, and May 11, 2013) at 1.[2] Plaintiff avers that during the meeting,

---

[2] Bryant mistakenly refers to the Deputy Assistant FSD as the "Assistant Deputy FSD." ECF 16-2 at 3. Defendant notes that the correct title is Deputy Assistant FSD. ECF 16-1 at 4 n.3.

Briseno "placed a chair in front of" Bryant and stated that Bryant "was having performances issues in check[ed] baggage." ECF 1 at 7.

According to plaintiff, Briseno "tried to pick a confrontation[,] a fight." *Id*. Bryant responded that he "did not have any issues." ECF 16-5 at 1. Briseno then told Bryant that his repeated questioning of colleagues was "bring[ing] up problems." *Id*.

In addition, Briseno questioned Bryant about a "grievance" that Bryant filed on December 7, 2012, in regard to an incident that took place on November 27, 2012. *See* ECF 1-7 at 6. In plaintiff's words, "I did not like [Briseno's] tone of voice, they was [sic] trying to push me to react in a violent manger [sic]." ECF 16-5 at 1. But, plaintiff claims he remained "calm" and stated that he "filed [Equal Employment Opportunity ("EEO")] complaints in the past." *Id*.

Also, Briseno raised concerns related to Bryant's prior request for a "religious accommodation." *Id*. at 2. Plaintiff felt like he was "being played with, to get [him] in the room to try to set [him] up." *Id*.

On May 16, 2013, according to the Employee Feedback Report (ECF 16-6), Bryant had "problems identifying" on a screening monitor an object in baggage and "had to ask" LTSO Melanie Preston "for help." Preston told Dawn Nearhood, a Supervisory Transportation Security Officer ("STSO") who is Caucasian, that Bryant "need[ed] more help with his recognition (bag and item) skills." ECF 16-7 (Nearhood Declaration).

That same day, Nearhood met with Bryant. *Id*.; ECF 1-5 at 5. Nearhood avers that during the meeting, Bryant shared that he was "having trouble with his eyes and that he is on medication for blood pressure." ECF 16-7. Further, he stated that "at times his vision becomes blurry and his

_____

Where evident in the record, I have included race and ethnicity of other TSA employees. Some of the references are derived from the "Decision" of the Administrative Judge. *See* ECF 1-5. In the Decision, the Administrative Judge uses the spelling of "Briceno" rather than "Briseno."

doctor told him when this happens he is to stop what he is doing, take his glasse[s] off and take a minute." *Id*. And, "his doctor want[ed] him to have his eyes checked for cataracts and [had] concerns about cataracts leading to blindness." *Id*. According to Nearhood, "[t]his concerned [her] due to the fact that [plaintiff's] job consists mostly of viewing images on the monitor and making a decision as to whether there is a threat in the bag." *Id*.

Following the meeting, Nearhood spoke with Transportation Security Manager ("TSM") William Shade, who is Caucasian. *Id*. Nearhood and Shade "made the decision to pull [Bryant] from screening duties and have him complete [online training] until further review/advisement on the issue." *Id*.

On May 17, 2013, plaintiff contacted an EEO counselor. *See* ECF 1-6 ("Final Order," dated December 29, 2016) at 1.[3] In an email of May 18, 2013 (ECF 16-8 at 2), Nearhood contacted two managers, Regina Richardson and Stephanie Jones, to solicit feedback regarding Bryant's work performance. On May 20, 2013, Jones responded with the following concerns, *id*.:

> 1. Object recognition… He is having great difficulty determining alarms. He sends an incredible amount of bags to the search area for possible [improvised explosive device [("IED")] when he see's [sic] bulk mass in orange. I have spoken to him about searching for other components needed for IED but unfortunately he doesn't seem to understand.

---

[3] Plaintiff maintains that he "filed . . . EEO complaints" prior to his 2013 EEO complaint underlying the present action. ECF 18 at 4. Notably, he filed grievances with the TSA on May 15, 2012 (HS-TSA-01536-2011); December 6, 2010 (HS-09-TSA-001121); and in July 2008 (HS-TSA-00268-2011).

Defendant avers that prior to plaintiff's 2013 EEO complaint, he filed four EEO complaints—one in 2009 and three in 2011. ECF 16-1 at 7. Defendant states that the last EEO complaint, filed in August 2011, "was dismissed for failure to timely contact an EEO counselor." *Id*.

To the extent of discrepancies in the dates and number of prior EEO complaints, the discrepancies are not material to the resolution of the case.

2. Time Searched…. He is having difficulty making a decision on his own without asking other officers their opinion on alarm items. This also sends bags to the search area because the time to make a decision has run out.. He is not able to use all of the tools available to him before the search times out.

3. Inattentiveness… I have a concerns [sic] about him not paying attention to what he's doing. He is not capable of talking and viewing bags at the same time. He is offended when asked to focus on the items on screen.

In an email dated May 20, 2013, Richardson, who is African-American, expressed "these same concerns" regarding Bryant's job performance. *Id.* at 1.

On May 20, 2013, Bryant emailed the TSA's Office of Civil Rights. ECF 18-2 at 6. He stated, *id.*:

Please add the other two names to the intake form also for retaliation and racial discrimination.
Melanie Preston and Dawn Nearhood. I put dawn Nearhood name in it to [sic] because she is in the retaliation also.
I will give the names of the deputy FSD for screening and the assistant FSD for screening when I talk to the counselor.
I did the intake form on 16 [M]ay 2013.
I have filed several EEO complaints in the past.
I do not appreciate Management trying to provoke violence in the work place behind closed doors because I filed EEO complaints and file a grievance that was filed.

In correspondence of May 26, 2013 (ECF 1-7 at 10-12), TSM Shade wrote to Bryant, requesting "additional medical documentation" concerning plaintiff's vision "to determine [his] ability to perform the full range of [his] TSO duties." *Id.* at 10. Shade noted that on May 16, 2013, plaintiff had told Nearhood of his "blurry vision," which "raised concerns" about his "ability to perform" his job. *Id.* at 10. Shade also stated that as a TSO, Bryant is required to meet certain physical requirements of his position, including "Distance vision correctable to 20/30 or better in the best eye and 20/100 or better in worst eye" and "Near vision correctable to 20/40 or better binocular." *Id.*

That same day, plaintiff emailed the TSA's Office of Civil Rights. ECF 1-8 at 9. He stated, in relevant part, *id.*:

> Mr. Bill Shade gave me a letter to go to a doctor. He said I told the STSO Dawn Dearhood [sic], said I had burry [sic] vision. I did not tell her that. I wear bifocals and I have to look down when I read.
>
> I do not like the racial aspects of the letter saying about my ability to perform my job including my repeatedly [sic] ability to lift over 70 pounds. I filed and [sic] EEO prior to this incident against her.. [sic] I told them there was nothing wrong with me. I just saw my doctor two months ago for a checkup including lab work. I am tired of the retaliations. . . . This is another form of retaliation that is prohibited under federal law.

On May 26, 2013, in another email to TSA's Office of Civil Rights (ECF 18-2 at 7), plaintiff stated, in pertinent part:

> I want to report I was given paper work from the security manager, that I had to go to my physician to feel [sic] out paper work, am I fit for duty.
>
> [T]his is a clear cover up for filing EEO complaints in the past, they are trying to use my eyeglasses as an excuse about my eye sight. I sent back the paper work last Friday.
>
> Let the counselor know to add this to the complaint. . . .

Shortly thereafter, Bryant complied with Shade's request. On June 12, 2013, plaintiff provided a completed "Certification of Health Care Provider" form (ECF 16-8), which stated that plaintiff could "perform all" job duties and that his "corrected vision" was "20/20." *Id.* at 2.

Nearhood and STSO Lakiesha Smith, who is African-American, met with Bryant on August 3, 2013, to conduct his mid-year performance review. ECF 16-10 (Smith Witness Statement Report, dated August 5, 2013); *see also* ECF 1 at 8. The written review indicated that Bryant "needs improvement" with On-Screen Alarm Resolution Protocol ("OSARP"), *i.e.*, "protocols and procedures and image recognition." ECF 16-11 (2013 Mid-Year Review).

In Smith's Witness Statement Report, she stated that plaintiff "became highly upset to the point that STSO Dawn, and [Smith] had to tell him several times to calm down." ECF 16-10 at 1.

According to Smith, "TSO Bryant started sliding in his chair back and forth, and at the time [she] asked him could he please stop, calm down and let's focus on his Mid-Year review." *Id*. And, "TSO Bryant also continued to get loud, and had to be told to lower his voice." *Id*.

In an email from Bryant to the TSA's Office of Civil Rights (ECF 18-2 at 11) on August 4, 2013, plaintiff stated, in relevant part:

> Dawn Nearhood a STSO supervisor who I filed an EEO complaint against several times has now put some of those issues against me in my midyear appraisal for the EEO complaints on 4 August 2013. I filed against them staring [sic] May 2013. The first complaint was against the Deputy FSD b [sic] on what they tried to start. The second complaint following against Dawn Nearhood and Melanie Preston on May 16,2013 [sic]. Then a third complaint following against Mr. shade [sic] Because Dawn Nearhood kept trying to get back. Now she has put some of those issues in my midyear appraisal in retaliation. I said in the remedy, theta [sic] the supervisors was [sic] not going to stop. On 30 July 2013 that the people was [sic] not going to stop.
> I told management on 18 May 2013 that dawn was not telling the truth. Retaliation is against the law. Many of them banded together in a pattern of events to try to make things happen. They are not going to stop, they keep trying to provoke. The courts will have to put and [sic] ending to this. Because they do not care. I want to file another EEO complaint for continual retaliations, they are not going to stop. The Secretary of Homeland Security said there will be no retaliations under the NO Fear act, so why do they keep on doing it, there [sic] way. It's not funny. I will ask the EEOC for a RIGHT TO SUE LETTER. Dawn is retaliating in her on [sic] way against federal law. The courts will have to may [sic] them stop.
> Please call me after 230 pm weekdays. That racist lady should leave me alone. She is very vindictive for filing against her. She does not know when to stop. We will go to court.

Also on August 4, 2013, TSO Michael Dixon and TSO Edra Parker "voiced their concerns" to Smith about Bryant's "erratic behavior." *Id*. Parker observed Bryant "having a personal conversation with <u>NO</u> one and he was constantly pacing the room adjusting things as if he were agitated about something." ECF 16-13 (Parker Witness Statement Report, dated August 5, 2013) (emphasis in original). Parker stated that plaintiff's behavior "made the atmosphere . . . very uncomfortable." *Id*.

Smith also observed plaintiff "continuously talking to himself" and "noticed" that he "clearly was upset." ECF 16-10 at 1. In addition, Preston informed Smith that several cleared bags "were sent up for search that should not have been deemed items." *Id.* Smith then reported this information to TSM Ivy Brewington, who is African-American. *Id.*; ECF 16-14 (Brewington Affidavit) at 23.

Smith avers that on August 5, 2013, LTSO Toni Davidson approached her about Bryant's "erratic behavior." ECF 16-10 at 1. In addition, Davidson "expressed her concerns of uneasiness with [plaintiff's] actions." *Id.* Smith and Brewington then met with plaintiff to discuss these concerns. *Id.*; *see also* ECF 1 at 8. Plaintiff "denied all claims." ECF 16-10 at 1.

Smith and Brewington held a meeting with Bryant and the entire checked baggage morning shift, which included Smith, Nearwood, Shade, and Richardson. *Id.* During the meeting, "several employees expressed their concerns with continuing to work" with Bryant, and mentioned that "he was humming to himself and talking to the walls." *Id.*; *see also* ECF 1 at 7. According to Brewington, Bryant "insisted" that "nothing was going on." ECF 16-14 at 4. Plaintiff asked Smith "what he supposedly said when he was talking to the walls in baggage, and she said she did not know[.]" *Id.*

Thereafter, Bryant returned to his duty station. *Id.* at 4. But, according to Brewington, Bryant's "behavior continued." *Id.* And, Brewington shared concerns with Briseno about Bryant's behavior. Briseno then wanted to meet with Bryant, but Bryant "was initially not willing to speak" with Briseno because Bryant "did not feel comfortable with [Briseno] at all." *Id.* Briseno then directed Brewington to tell Bryant that he could either "get a SF-71 and go home, go to the break room, or go on the exit lane . . . ." *Id.*; *see also id.* at 5. In Brewington's words, "We were trying to resolve the Officers' concerns and Mr. Bryant's concerns before putting him back in baggage.

Most of the time I was working with him and trying to keep him calm so the situation would not escalate." *Id*. at 4.

Brewington "totally disagree[s]" with any claim that plaintiff's race was a factor in regard to the accusations that he was humming to himself and talking to the walls. ECF 16-14 at 5. She observed that she and Ms. Smith are African American and Mr. Briseno is not Caucasian. *Id.* She added, *id.:* "I don't believe race had anything to do with this."

On August 8, 2013, Bryant's supervisors directed him to undergo additional OSARP training on August 15 and August 19, 2013. *Id*. at 5-6. Craig Hudson, a TSA Expert Security Training Instructor, conducted the training. In an email from Hudson to Bryant's supervisors, dated August 20, 2013 (ECF 16-15), Hudson concluded that Bryant was "quite capable of working in checked baggage." Hudson further observed, *id*.: "Officer Bryant, while not the strongest person in knowing OSARP, does know the process and does follow the steps." Hudson advised that plaintiff not work in a Network Explosives Detection System ("NEDS"), such as Southwest Airlines or Delta Airlines, because "his time frame in making a decision is impacted by the limited amount of time that is given to search a bag at Southwest or Delta." *Id*. Instead, Hudson recommended that plaintiff "return back to checked baggage." *Id*.

TSA notified plaintiff on August 13, 2013, as to the conclusion of EEO counseling and his right to file a formal EEO complaint. ECF 1-6 at 2. Plaintiff filed an EEO complaint on September 9, 2013. ECF 1-4 at 5.

In a letter from TSA's Civil Rights Division to Bryant, dated November 14, 2013 (ECF 16-16), TSA accepted the following allegations for investigation, *id*. at 1-2:

> You, a Transportation Security Officer (TSO), SV-1802, (Band-E), at Baltimore Washington International (BWI) Airport, Glen Burnie, Maryland, were subjected to harassment which created a hostile work environment based on race

(African-American) and reprisal (prior EEO activity, HS-TSA-01121-2009; HS-TSA-00268-2011; HS-TSA-00854-2011 and HS-TSA-01536-2011) when:

1.      On May 11, 2013, the Deputy Assistant Federal Security Director (DAFSD), when he placed a chair in front of you and stated you were having performance issues in check baggage.

2.      On May 26, 2013, the Transportation Security Manager (TSM) gave you a Fitness for Duty form to be completed by your physician.

3.      On August 4, 2013, issues you were having with management were placed in your mid-year evaluation.

4.      On August 5, 2013, the TSM said you were observed humming to yourself and cursing; she advised you that you had three options: go to the exit lanes, complete a SF-71 and go home, or go to the break room.

5.      On August 8, 2013, you were given a training plan from the TSM which required you to take remedial training.

On March 27, 2014, TSA forwarded to plaintiff a copy of the investigative file, providing plaintiff notice of his right to request a hearing before an EEOC Administrative Judge ("AJ") or, alternatively, to receive a Final Agency Decision ("FAD"). *Id*. On March 31, 2014, plaintiff filed a request for a hearing before an AJ.

TSA moved for summary judgment on August 24, 2015. Pursuant to 29 C.F.R. § 1614.109(g), the AJ issued a "Decision" (ECF 1-5), without a hearing, on November 28, 2016. The AJ granted TSA's motion, concluding that the evidence did not warrant a hearing or support plaintiff's allegations of discrimination. *Id*. at 11. The AJ reasoned, *id*. at 8:

> Even assuming that the alleged conduct was sufficiently severe or pervasive to create a hostile work environment, Complainant has failed to show that the Agency's actions were based on discriminatory or retaliatory animus. Complainant has not presented any sworn statements from other witnesses or documents that contradict the explanations offered by his supervisors or which call their veracity into question. *Complainant v. Dep't of Veterans Affairs*, EEOC Appeal No. 0120132783 (Sept. 11, 2015). Complainant has provided no evidence of that his race and prior EEO activity were motivating factors for the actions taken by management officials to address his performance and other workplace concerns.

The AJ issued an "Order Entering Judgment" on November 28, 2016. ECF 1-5 at 1.

On December 7, 2016, the DHS Office for Civil Rights and Civil Liberties ("CRCL") received the AJ's decision. ECF 1-6 at 2. In a Final Order of December 29, 2016 (ECF 1-6), the CRCL "fully implement[ed]" the AJ's "decision finding no discrimination, as the final action in this matter." *Id*. at 1. The Final Order included a notice informing plaintiff "of the right to appeal to the [EEOC] or to file a civil action in an appropriate United States District Court." *Id*. at 4.

Bryant filed an appeal to the EEOC, Office of Federal Operations ("OFO"), on December 28, 2016.[4] ECF 1-4 at 1-4. In a "Decision" of September 20, 2017 (ECF 1-4 at 5-9), the OFO affirmed the Final Order, concluding that "the evidence did not establish that [Bryant] was discriminated against by the Agency as alleged." *Id*. at 7. Plaintiff timely requested reconsideration of the Decision, which the OFO denied on February 2, 2018. ECF 1-3 (Decision on Request for Reconsideration).

This suit followed on April 23, 2018. ECF 1.

Additional facts are included, *infra*.

## II.    Legal Standards

### A.

Title VII prohibits an employer, *inter alia*, from discriminating against "any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin." 42 U.S.C. § 2000e–2. It also bars retaliation based on an employee's opposition to conduct made unlawful by Title VII, or for participation in a Title VII investigation or proceeding. 42 U.S.C. § 2000e-3; *see e.g., Young v.*

---

[4] Chrystal R. Young, Deputy Officer of CRCL, apparently signed the Final Order on December 29, 2016. ECF 1-6 at 3. However, plaintiff filed his "Notice of Appeal/Petition" (ECF 1-4 at 1) to the EEOC on December 28, 2016.

*United Parcel Serv., Inc.*, 575 U.S. ____, 135 S. Ct. 1338, 1344 (2015); *Perkins v. International Paper Co.*, ___ F.3d ___, No. 18-1507, slip op. at 7 (4th Cir. Aug. 27, 2019); *Ray v. Int'l Paper Co.*, 909 F.3d 661, 666 (4th Cir. 2018); *Netter v. Barnes*, 908 F.3d 932, 937 (4th Cir. 2018); *Strothers v. City of Laurel*, 895 F. 3d 317, 326-27 (4th Cir. 2018); *DeMasters v. Carilion Clinic*, 796 F.3d 409, 416 (4th Cir. 2015); *Boyer-Liberto v. Fontainebleau Corp.*, 786 F.3d 264, 298 (4th Cir. 2015) (en banc); *Freeman v. Dal-Tile Corp.*, 750 F.3d 413, 420 (4th Cir. 2014).

Title VII's prohibitions apply to private sector employees as well as federal employees. *Nielsen v. Hagel*, 666 F. App'x 225, 227 (4th Cir. 2016) (citing 42 U.S.C. § 2000e-16(a)).[5] Before filing suit under Title VII, however, a plaintiff must exhaust administrative remedies. *See Patterson v. McLean Credit Union*, 491 U.S. 164, 181 (1989) (private sector employees), *superseded on other grounds by* 42 U.S.C. § 1981(b); *Brown v. Gen. Servs. Admin.*, 425 U.S. 820, 832 (1976) (federal employees); *see also McCray v. Md. Dep't of Transp.*, 662 F. App'x 221, 224 (4th Cir. 2016). Notably, "[t]he administrative remedies available for federal employees are significantly broader" than those available to employees in the private sector. *Laber v. Harvey*, 438 F.3d 404, 416 (4th Cir. 2006) (en banc). *See* 42 U.S.C. § 2000e-16(c) (setting forth the conditions under which a federal employee may initiate a civil suit under Title VII).[6]

---

[5] Title VII initially did not protect federal employees. *See* 42 U.S.C. § 2000e(b) (excluding the United States from the definition of "employer"). In 1972, however, Congress amended Title VII to provide that a federal employee who has exhausted her administrative remedies "may file a civil action as provided in section 2000e-5 of this title" against the "head of the department, agency, or unit, as appropriate." 42 U.S.C. § 2000e-16(c); *see Bullock v. Napolitano*, 666 F.3d 281, 283-84 (4th Cir. 2012), *cert. denied*, 568 U.S. 882 (Oct. 1, 2012).

[6] Exhaustion under Title VII is not jurisdictional. *See Fort Bend Cty. v. Davis*, ___ U.S. ___, 139 S. Ct. 1843, 1846, 1850 (2019). Rather, it is a "claim-processing rule[] that must be timely raised to come into play." *Id.* at 1846.

There is no contention as to exhaustion. Nonetheless, I shall review the process that was followed here, because it is pertinent to the content of the record. And, the content of the record is relevant to my decision to construe the Motion, in part, as one for summary judgment.

Federal employees "who believe they have been discriminated against on the basis of race, color, religion, sex, national origin, age, disability, or genetic information must consult [an EEO] Counselor [in the employee's federal agency] prior to filing [an agency EEO] complaint in order to try to informally resolve the matter." 29 C.F.R. § 1614.105(a); *see also Nielsen*, 666 F. App'x at 227; *Young v. Nat'l Ctr. for Health Serv. Research*, 828 F.2d 235, 237 (4th Cir. 1987). The employee "must initiate contact with a Counselor within 45 days of the date of the matter alleged to be discriminatory." 29 C.F.R. § 1614.105(a)(1); *see also Nielsen*, 666 F. App'x at 227; *Verrier v. Sebelius*, CCB-09-402, 2010 WL 1222740, at *8 (D. Md. Mar. 23, 2010).

The EEO counselor must "conduct an initial counseling session, during which the counselor must inform the aggrieved party in writing of his rights and responsibilities, and offer the employee the option of pursuing alternative dispute resolution (ADR)." *Nielsen*, 666 F. App'x at 227 (citing 29 C.F.R. §§ 1614.105(b)(1), (2)). Counseling may lead to the withdrawal of the claim or a settlement agreement between the employee and employer. *See* 29 C.F.R. § 1614.504(a); *Campbell v. Geren*, 353 F. App'x 879, 882 (4th Cir. Nov. 30, 2009). If the employee chooses to pursue ADR, the EEO counselor must conduct a "final interview" within 90 days of the initial interview. 29 C.F.R. §§ 1614.105(d), (f). At the end of the 90 day period, if the matter is not resolved, "the counselor must issue a written notice of right to file a formal complaint within the agency." *Nielson*, 666 F. App'x at 227 (citing 29 C.F.R. § 1614.105(d)-(f)). Thereafter, the aggrieved party must file a formal complaint with the agency within 15 days of receipt of notice from the agency. *See* 29 C.F.R. §§ 1614.105(d), 1614.106(b).

Once the agency takes "final action" on the formal complaint, the aggrieved party may appeal the decision to the EEOC or, within 90 days, file a civil action. *See* 42 U.S.C. § 2000e-16; 29 C.F.R. §§ 1614.110, 1614.401, 1614.407(a); *see also Nielsen*, 666 F. App'x at 228. If an employee appeals to the EEOC, the Office of Federal Operations ("OFO") "reviews the record, supplements it if necessary, and then issues a written decision." *Scott v. Johanns*, 409 F.3d 466, 468 (D.C. Cir. 2005) (citing 29 C.F.R. § 1614.404-05). A decision by the OFO is considered to be final, "triggering the right to sue" in court. *Scott*, 409 F.3d at 468 (citing 29 C.F.R. § 1614.405(b)). The employee must initiate the civil lawsuit "[w]ithin 90 days of receipt of the Commission's final decision on an appeal." 29 C.F.R. §§ 1614.407(a), (c). If the agency fails to issue a final decision within 180 days of receipt of the formal complaint, or if the EEOC fails to rule within 180 days of the filing, the aggrieved party may also sue. 29 C.F.R. §§ 1615.407(b), (d).

## B.

As noted, defendant's Motion is styled as a "Motion to Dismiss Or, In the Alternative, For Summary Judgment." A motion styled in the alternative implicates the court's discretion under Rule 12(d) of the Federal Rules of Civil Procedure. *See Kensington Vol. Fire Dep't, Inc. v. Montgomery Cty.*, 788 F. Supp. 2d 431, 436-37 (D. Md. 2011).

Ordinarily, a court "is not to consider matters outside the pleadings or resolve factual disputes when ruling on a motion to dismiss." *Bosiger v. U.S. Airways*, 510 F.3d 442, 450 (4th Cir. 2007). However, under Rule 12(b)(6), a court, in its discretion, may consider matters outside of the pleadings, pursuant to Rule 12(d). If the court does so, "the motion must be treated as one for summary judgment under Rule 56," and "[a]ll parties must be given a reasonable opportunity to present all the material that is pertinent to the motion." Fed. R. Civ. P. 12(d). But, when the

movant expressly captions its motion "in the alternative" as one for summary judgment, and submits matters outside the pleadings for the court's consideration, the parties are deemed to be on notice that conversion under Rule 12(d) may occur; the court "does not have an obligation to notify parties of the obvious." *Laughlin v. Metro. Wash. Airports Auth.*, 149 F.3d 253, 261 (4th Cir. 1998).[7]

A district judge has "complete discretion to determine whether or not to accept the submission of any material beyond the pleadings that is offered in conjunction with a Rule 12(b)(6) motion and rely on it, thereby converting the motion, or to reject it or simply not consider it." 5 C WRIGHT & MILLER, FEDERAL PRACTICE & PROCEDURE § 1366 (3d ed. 2018). This discretion "should be exercised with great caution and attention to the parties' procedural rights." *Id.* In general, courts are guided by whether consideration of extraneous material "is likely to facilitate the disposition of the action," and "whether discovery prior to the utilization of the summary judgment procedure" is necessary. *Id.*

Summary judgment ordinarily is inappropriate "where the parties have not had an opportunity for reasonable discovery." *E.I. du Pont de Nemours and Co. v. Kolon Indus., Inc.*, 637 F.3d 435, 448-49 (4th Cir. 2011). As the Fourth Circuit has said, when a district judge rules on a summary judgment motion prior to discovery, it is akin to "for[cing] the non-moving party into a fencing match without a sword or mask." *McCray v. Md. Dep't of Transp., Md. Transit*

---

[7] In contrast, a court may not convert a motion to dismiss to one for summary judgment *sua sponte*, unless it gives notice to the parties that it will do so. *See Laughlin*, 149 F.3d at 261 (stating that a district court "clearly has an obligation to notify parties regarding any court-instituted changes" in the posture of a motion, including conversion under Rule 12(d)); *Finley Lines Joint Protective Bd. Unit 200 v. Norfolk So. Corp.*, 109 F.3d 993, 997 (4th Cir. 1997) ("[A] Rule 12(b)(6) motion to dismiss supported by extraneous materials cannot be regarded as one for summary judgment until the district court acts to convert the motion by indicating that it will not exclude from its consideration of the motion the supporting extraneous materials.").

*Admin.*, 741 F.3d 480, 483 (4th Cir. 2014)); *accord Putney v. Likin*, 656 F. App'x 632, 639 (4th Cir. 2016) (per curiam).

However, "the party opposing summary judgment 'cannot complain that summary judgment was granted without discovery unless that party has made an attempt to oppose the motion on the grounds that more time was needed for discovery.'" *Harrods Ltd. v. Sixty Internet Domain Names*, 302 F.3d 214, 244 (4th Cir. 2002) (quoting *Evans v. Techs. Applications & Serv. Co.*, 80 F.3d 954, 961 (4th Cir. 1996)). To raise adequately the issue that discovery is needed, the nonmovant typically must file an affidavit or declaration pursuant to Rule 56(d) (formerly Rule 56(f)), explaining why, "for specified reasons, it cannot present facts essential to justify its opposition," without needed discovery. Fed. R. Civ. P. 56(d); *see Harrods*, 302 F.3d at 244-45 (discussing affidavit requirement of former Rule 56(f)).

To justify a denial of summary judgment on the grounds that additional discovery is necessary, the facts identified in a Rule 56 affidavit must be 'essential to the [the] opposition.'" *Scott v. Nuvell Fin. Servs., LLC*, 789 F. Supp. 2d 637, 641 (D. Md. 2011) (alteration in original) (citation omitted). A nonmoving party's Rule 56(d) request for additional discovery is properly denied "where the additional evidence sought for discovery would not have by itself created a genuine issue of material fact sufficient to defeat summary judgment." *Strag v. Bd. of Trs., Craven Cmty. Coll.*, 55 F.3d 943, 954 (4th Cir. 1995); *see McClure v. Ports*, 914 F.3d 866, 874 (4th Cir. 2019); *Pisano v. Strach*, 743 F.3d 927, 931 (4th Cir. 2014); *Amirmokri v. Abraham*, 437 F. Supp. 2d 414, 420 (D. Md. 2006), *aff'd*, 266 F. App'x 274 (4th Cir. 2008) (per curiam), *cert. denied*, 555 U.S. 885 (2008).

If a nonmoving party believes that further discovery is necessary before consideration of summary judgment, the party who fails to file a Rule 56(d) affidavit does so at his peril, because

"'the failure to file an affidavit…is itself sufficient grounds to reject a claim that the opportunity for discovery was inadequate.'" *Harrods,* 302 F.3d at 244 (citations omitted). But, the non-moving party's failure to file a Rule 56(d) affidavit cannot obligate a court to issue a summary judgment ruling that is obviously premature. "This is especially true where, as here, the non-moving party is proceeding pro se."

Although the Fourth Circuit has placed "'great weight'" on the Rule 56(d) affidavit, and has said that a mere "'reference to Rule 56(f) [now Rule 56(d)] and the need for additional discovery in a memorandum of law in opposition to a motion for summary judgment is not an adequate substitute for [an] affidavit,'" the appellate court has "not always insisted" on a Rule 56(d) affidavit. *Id.* (internal citations omitted). According to the Fourth Circuit, failure to file an affidavit may be excused "if the nonmoving party has adequately informed the district court that the motion is premature and that more discovery is necessary" and the "nonmoving party's objections before the district court 'served as the functional equivalent of an affidavit.'" *Id.* at 244-45 (internal citations omitted).

Mr. Bryant, who is pro se, has not filed an Affidavit under Rule 56(d). Nor has he suggested that he would be prejudiced without discovery. Notably, the record is well developed, in light of the administrative process that preceded the litigation, where plaintiff had the opportunity to engage in discovery. ECF 1-5 at 3. Plaintiff was deposed on July 16, 2015 (ECF 16-17) and other witnesses were interviewed. *See*, *e.g.*, ECF 16-10. Moreover, plaintiff has not challenged the defense exhibits to the Motion and has submitted several of his own.

Therefore, I am satisfied that it is appropriate to address the Motion as one for summary judgment with respect to the Title VII claims, because this will facilitate disposition of the case. But, I shall construe the Motion as one to dismiss with regard to the No Fear Act Claim. And, the

Court is mindful that pleadings filed by a pro se litigant are liberally construed and, "'however inartfully pleaded, must be held to less stringent standards than formal pleadings drafted by lawyers.'" *Erickson v. Pandus*, 551 U.S. 89, 94 (2007) (citation omitted). *See* Fed. R. Civ. P. 8(f) ("All pleadings shall be so construed as to do substantial justice"); *see also Haines v. Kerner*, 404 U.S. 519, 520 (1972) (stating that claims of self-represented litigants are held "to less stringent standards than formal pleadings drafted by lawyers"); *Bala v. Cmm'w of Va. Dep't of Conservation & Recreation*, 532 F. App'x 332, 334 (4th Cir. 2013) (same).

As to the No Fear Act Claim, I shall apply Rule 12(b)(6). A defendant may test the legal sufficiency of a complaint by way of a motion to dismiss under Rule 12(b)(6). *In re Birmingham*, 846 F.3d 88, 92 (4th Cir. 2017); *Goines v. Valley Cmty. Servs. Bd.*, 822 F.3d 159, 165-66 (4th Cir. 2016); *McBurney v. Cuccinelli*, 616 F.3d 393, 408 (4th Cir. 2010), *aff'd sub nom.*, *McBurney v. Young*, 569 U.S. 221 (2013); *Edwards v. City of Goldsboro*, 178 F.3d 231, 243 (4th Cir. 1999). A Rule 12(b)(6) motion constitutes an assertion by a defendant that, even if the facts alleged by a plaintiff are true, the complaint fails as a matter of law "to state a claim upon which relief can be granted."

Whether a complaint states a claim for relief is assessed by reference to the pleading requirements of Fed. R. Civ. P. 8(a)(2). That rule provides that a complaint must contain a "short and plain statement of the claim showing that the pleader is entitled to relief." The purpose of the rule is to provide the defendants with "fair notice" of the claims and the "grounds" for entitlement to relief. *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555-56 (2007).

To survive a motion under Fed. R. Civ. P. 12(b)(6), a complaint must contain facts sufficient to "state a claim to relief that is plausible on its face." *Twombly*, 550 U.S. at 570; *see Ashcroft v. Iqbal*, 556 U.S. 662, 684 (2009) (citation omitted) ("Our decision in *Twombly* expounded the

pleading standard for 'all civil actions' . . . ."); *see also Paradise Wire & Cable Defined Benefit Pension Plan v. Weil*, 2019 WL 1105179, at *3 (4th Cir. Mar. 11, 2019); *Willner v. Dimon*, 849 F.3d 93, 112 (4th Cir. 2017). To be sure, a plaintiff need not include "detailed factual allegations" in order to satisfy Rule 8(a)(2). *Twombly*, 550 U.S. at 555. Moreover, federal pleading rules "do not countenance dismissal of a complaint for imperfect statement of the legal theory supporting the claim asserted." *Johnson v. City of Shelby, Miss.*, 574 U.S. 10, ___, 135 S. Ct. 346, 346 (2014) (per curiam). But, mere "'naked assertions' of wrongdoing" are generally insufficient to state a claim for relief. *Francis v. Giacomelli*, 588 F.3d 186, 193 (4th Cir. 2009) (citation omitted).

As to the Title VII claims, I look to Fed. R. Civ. P. 56. Under Rule 56(a) of the Federal Rules of Civil Procedure, summary judgment is appropriate only "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-24 (1986); *see Iraq Middle Mkt. Dev. Found. v. Harmoosh*, 848 F.3d 235, 238 (4th Cir. 2017) ("A court can grant summary judgment only if, viewing the evidence in the light most favorable to the non-moving party, the case presents no genuine issues of material fact and the moving party demonstrates entitlement to judgment as a matter of law."). The nonmoving party must demonstrate that there are disputes of material fact so as to preclude the award of summary judgment as a matter of law. *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 585-86.

The Supreme Court has clarified that not every factual dispute will defeat the motion. "By its very terms, this standard provides that the mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." *Anderson*, 477 U.S. at 247-48 (emphasis in original). A fact is "material" if it "might affect the outcome of the suit under the

governing law." *Id.* at 248. There is a genuine issue as to material fact "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.*; *see also Variety Stores, Inc. v. Wal-Mart Stores, Inc.*, 888 F.3d 651, 659 (4th Cir. 2018); *Sharif v. United Airlines, Inc.*, 841 F.3d 199, 204 (4th Cir. 2016); *Raynor v. Pugh*, 817 F.3d 123, 130 (4th Cir. 2016).

"A party opposing a properly supported motion for summary judgment 'may not rest upon the mere allegations or denials of [its] pleadings,' but rather must 'set forth specific facts showing that there is a genuine issue for trial.'" *Bouchat v. Balt. Ravens Football Club, Inc.*, 346 F.3d 514, 522 (4th Cir. 2003) (quoting former Fed. R. Civ. P. 56(e)), *cert. denied*, 541 U.S. 1042 (2004); *see also Celotex*, 477 U.S. at 322-24. Moreover, in resolving a summary judgment motion, a court must view all of the facts, including reasonable inferences to be drawn from them, in the light most favorable to the nonmoving party. *Matsushita Elec. Indus. Co. Ltd.*, 475 U.S. at 587; *Hannah P. v. Coats*, 916 F.3d 327, 336 (4th Cir. 2019); *Variety Stores, Inc.*, 888 F.3d at 659; *Gordon*, 890 F.3d at 470; *Roland v. United States Citizenship & Immigration Servs.*, 850 F.3d 625, 628 (4th Cir. 2017); *Lee v. Town of Seaboard*, 863 F.3d 323, 327 (4th Cir. 2017); *FDIC v. Cashion*, 720 F.3d 169, 173 (4th Cir. 2013). However, summary judgment is appropriate if the evidence "is so one-sided that one party must prevail as a matter of law." *Anderson*, 477 U.S. at 252. But, "the mere existence of a scintilla of evidence in support of the [movant's] position will be insufficient; there must be evidence on which the jury could reasonably find for the [movant]." *Id.*

Notably, the district court's "function" is not "to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Anderson*, 477 U.S. at 249; *accord Guessous v. Fairview Prop. Inv., LLC*, 828 F.3d 208, 216 (4th Cir. 2016). Thus, in considering a summary judgment motion, the court may not make credibility determinations. *Wilson v. Prince George's Cty.*, 893 F.3d 213, 218-19 (4th Cir. 2018); *Jacobs v.*

*N.C. Admin. Office of the Courts*, 780 F.3d 562, 569 (4th Cir. 2015); *Mercantile Peninsula Bank v. French*, 499 F.3d 345, 352 (4th Cir. 2007). Therefore, in the face of conflicting evidence, such as competing affidavits, summary judgment ordinarily is not appropriate, because it is the function of the fact-finder to resolve factual disputes, including matters of witness credibility. *See Black & Decker Corp. v. United States*, 436 F.3d 431, 442 (4th Cir. 2006); *Dennis v. Columbia Colleton Med. Ctr., Inc.*, 290 F.3d 639, 644-45 (4th Cir. 2002).

In sum, to avoid summary judgment, there must be a genuine dispute as to material fact. In *Iraq Middle Mkt. Dev. Found.*, 848 F.3d at 238, the Court reiterated: "A court can grant summary judgment only if, viewing the evidence in the light most favorable to the non-moving party, the case presents no genuine issues of material fact and the moving party demonstrates entitlement to judgment as a matter of law."

### III.    Discussion

### A.    The No Fear Act

Plaintiff relies on the No Fear Act, 5 U.S.C. §§ 2301 *et seq.* He alleges that defendant retaliated against him, in violation of the statute. ECF 1 at 3.

The No Fear Act is a reporting statute that "require[s] that Federal agencies be accountable for violations of antidiscrimination and whistleblower protection laws; to require that each Federal agency post quarterly on its public Web site, certain statistical data relating to Federal sector equal employment opportunity complaints filed with such agency; and for other purposes." 107 P.L. 174, 116 Stat. 566. As defendant points out, the No Fear Act "does not provide a private cause of action." *Williams v. Spencer*, 883 F. Supp. 2d 165, 182 (D.D.C. 2012); *see also Glaude v. United States*, 248 F. App'x 175, 177 (Fed. Cir. 2007) ("Of the few courts that have considered claims

made under the No Fear Act, none have found that the Act provides a private cause of action or creates a substantive right for which the government must pay damages.")

Accordingly, plaintiff's reliance on the No Fear Act is unavailing. The claim is subject to dismissal, pursuant to Rule 12(b)(6), because plaintiff has not stated a claim under the statute.

### B.      Title VII

### 1.      Methods of Proof

Relying on Title VII, plaintiff asserts claims against DHS for retaliation and race discrimination, in the form of a hostile work environment.

In general, *at trial* a plaintiff "may establish a discrimination claim under Title VII through two avenues of proof." *Thomas v. Delmarva Power & Light Co.*, 715 F. App'x 301, 302 (4th Cir. 2018) (per curiam) (citing *Hill v. Lockheed Martin Logistics Mgmt., Inc.*, 354 F.3d 277, 284 (4th Cir. 2004) (en banc), *abrogated on other grounds by Univ. of Tex. Sw. Med. Ctr. v. Nassar*, 570 U.S. 338 (2013)). The plaintiff's first avenue is to offer "'direct or indirect'" evidence of discrimination under "'ordinary principles of proof.'" *Burns v. AAF-McQuay, Inc.*, 96 F.3d 728, 731 (4th Cir. 1996) (citation omitted), *cert. denied*, 520 U.S. 1116 (1997). The plaintiff's second avenue is to follow the burden-shifting approach first articulated by the Supreme Court in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). *See, e.g.*, *Young*, 135 S. Ct. at 1345 (construing the Pregnancy Discrimination Act); *Guessous v. Fairview Prop. Inv., LLC*, 828 F.3d 208, 216 (4th Cir. 2016) (discussing the *McDonnell Douglas* framework).

At summary judgment, reference to the avenues of proof serves to inform a court's evaluation of a motion to dismiss or for summary judgment. *See Haynes v. Waste Connections, Inc.*, 922 F.3d 219, 223 (4th Cir. 2019) (recognizing that a Title VII plaintiff may avoid summary judgment by proceeding under the burden – shifting framework established in *McDonnell Douglas*

*Corp. . . .*"); *Pettis v. Nottoway Cty. Sch. Bd.*, 592 F. App'x 158, 160 (4th Cir. 2014) (stating that a plaintiff asserting racial discrimination "may avoid summary judgment by proceeding under the burden-shifting framework established in *McDonnell Douglas* . . . .").

There is no direct evidence of discrimination in this case. Therefore, I turn to review the *McDonnell Douglas* proof scheme. It is "a procedural device, designed only to establish an order of proof and production." *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 521 (1993) (emphasis omitted). Under the *McDonnell Douglas* approach, the "ultimate burden of persuasion [at trial] never 'shifts' from the plaintiff," who must prove intentional unlawful discrimination. *Williams v. Cerberonics, Inc.*, 871 F.2d 452, 456 n.2 (4th Cir. 1989) (citation omitted). Notably, "the *McDonnell Douglas* test is inapplicable where the plaintiff presents direct evidence of discrimination." *Trans World Airlines, Inc. v. Thurston*, 469 U.S. 111, 121 (1985).

If the plaintiff chooses to proceed at trial under the *McDonnell Douglas* approach, the plaintiff must first establish a "prima facie case of discrimination." *Merritt v. Old Dominion Freight Line, Inc.*, 601 F.3d 289, 294 (4th Cir. 2010); *see Abilt v. Central Intelligence Agency*, 848 F.3d 305, 315 (4th Cir. 2017). Although the precise formulation of the required prima facie showing will vary in "different factual situations," *McDonnell Douglas*, 411 U.S. at 802 n.13, the plaintiff is generally required to show that the employer took adverse action against an applicant "under circumstances which give rise to an inference of unlawful discrimination." *Texas Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 253 (1981).

If a plaintiff establishes a prima facie case of unlawful discrimination, "a presumption of illegal discrimination arises, and the burden of production shifts to the employer" to produce evidence of a legitimate, non-discriminatory reason for its adverse employment action. *Hoyle v. Freightliner, LLC*, 650 F.3d 321, 336 (4th Cir. 2011); *see Reeves v. Sanderson Plumbing Prods.,*

*Inc.*, 530 U.S. 133, 142 (2000); *Hurst v. District of Columbia*, 681 F. App'x 186, 189-90 (4th Cir. 2017) (per curiam). "If the defendant carries this burden of production, the presumption raised by the prima facie case is rebutted." *Burdine*, 450 U.S. at 255. In that circumstance, "the *McDonnell Douglas* framework—with its presumptions and burdens—is no longer relevant," and "simply drops out of the picture." *St. Mary's Honor Ctr.*, 509 U.S. at 510-11. The plaintiff must then prove, by a preponderance of evidence, "that the [employer's] proffered reason was not the true reason for the employment decision" and that the plaintiff "has been the victim of intentional discrimination." *Burdine*, 450 U.S. at 256; *see also Reeves*, 530 U.S. at 143; *St. Mary's Honor Ctr.*, 509 U.S. at 516-20; *Adams v. Trs. of Univ. of North Carolina-Wilmington*, 640 F.3d 550, 560 (4th Cir. 2011) ("[I]n demonstrating the Defendants' decision was pretext, [plaintiff] had to prove '*both* that the reason was false, *and* that discrimination was the real reason.'") (quoting *Jiminez v. Mary Washington Coll.*, 57 F.3d 369, 378 (4th Cir. 1995)) (emphasis in original).

Conversely, if the defendant does not submit evidence of a legitimate basis for its actions, the factfinder may "infer discriminatory animus because experience has proved that in the absence of any other explanation it is more likely than not that those actions were bottomed on impermissible considerations." *Furnco Const. Corp. v. Waters*, 438 U.S. 567, 579-80 (1978). And, if the defendant fails to meet the burden of producing "evidence which, *taken as true*, would *permit* the conclusion that there was a nondiscriminatory reason for the adverse action," then "the court must award judgment to the plaintiff as a matter of law." *St. Mary's Honor Ctr.*, 509 U.S. at 509 (emphasis in original). This is because a legal presumption of intentional discrimination has been established. *Id.* at 510 n.3; *see Burdine*, 450 U.S. at 255 n.8 ("[T]he allocation of burdens and the creation of a presumption by the establishment of a prima facie case is intended progressively to sharpen the inquiry into the elusive factual question of intentional

discrimination.").

As noted, these two approaches establish the common methods by which a plaintiff may prove intentional employment discrimination *at trial*. *See Burns*, 96 F.3d at 731. At summary judgment, these approaches help to guide a court's evaluation of the evidence. *Pettis*, 592 F. App'x at 160 (stating that a plaintiff asserting racial discrimination "may avoid summary judgment by proceeding under the burden-shifting framework established in *McDonnell Douglas* . . . .").[8]

## 2. Retaliation

Plaintiff contends that TSA management retaliated against him for filing multiple EEO complaints. In particular, plaintiff alleges that his supervisors retaliated against him based on the following actions, ECF 1 at 7-9:

> (1) On May 11, 2013, Deputy Assistant FSD Briseno allegedly threatened Bryant by placing a chair in front of him and stated that Bryant was having performance issues in checked baggage;

---

[8] In *Swierkiewicz v. Sorema*, 534 U.S. 506, 510 (2002), the Supreme Court explained that the "prima facie case under *McDonnell Douglas* . . . is an evidentiary standard, not a pleading requirement." The Court stated that it had "never indicated that the requirements for establishing a prima facie case under *McDonnell Douglas* also apply to the pleading standard that plaintiffs must satisfy in order to survive a motion to dismiss." *Id.* at 511. Thus, the Court said: "[A]n employment discrimination plaintiff need not plead a prima facie case of discrimination . . . ." *Id.* at 515; *see also Stennis v. Bowie State Univ.*, 716 F. App'x 164, 166 n.2 (4th Cir. 2017) (per curiam); *McCleary-Evans v. Md. Dep't of Transp., State Highway Admin.*, 780 F.3d 582, 584 (4th Cir. 2015), *cert. denied*, 136 S. Ct. 1162 (2016).

In *Woods v. City of Greensboro*, 855 F.3d 639, 648 (4th Cir. 2017), *cert. denied*, ___ U.S. ____, 138 S. Ct. 558 (2017), the Fourth Circuit indicated that although a plaintiff "need not plead facts sufficient to establish a prima facie case of race-based discrimination to survive a motion to dismiss," the "pleading standard established in *Iqbal* and *Twombly* applies . . . ." The question at the motion to dismiss stage is whether the plaintiff has stated "a plausible claim for relief under Title VII . . . ." *Ciociola v. Balt. City Bd. of Sch. Commissioners*, CCB-15-1451, 2016 WL 125597, at *4 (D. Md. Jan. 12, 2016).

In this case, however, as to Title VII, the Motion is one for summary judgment. Therefore, the Court has reviewed the evidence presented by the parties.

(2) On May 26, 2013, TSM Shade requested medical documentation related to Bryant's vision;

(3) On August 4, 2013, Bryant received critical feedback from management in his mid-year evaluation;

(4) On August 5, 2013, TSM Brewington observed Bryant humming and talking to himself and she advised him that he could go to the exit lanes or the break room or fill out a leave slip and go home for the day; and

(5) On August 8, 2013, Bryant's supervisors directed him to complete additional training.

To establish a prima facie claim of retaliation under Title VII, "a plaintiff must show that (1) that the plaintiff engaged in a protected activity, such as filing a complaint with the EEOC"; (2) the employer took an adverse action against the plaintiff; and (3) "'the protected activity was causally connected to the employer's adverse action.'" *Okoli v. City of Balt.*, 648 F.3d 216, 223 (4th Cir. 2011) (citation omitted). *See Evans v. International Paper Co.*, ___ F.3d ___, No. 18-1448, slip op. at 16 (4th Cir. Aug. 27, 2019); *Strothers v. City of Laurel, Md.*, 895 F.3d 317, 327 (4th Cir. 2018); *Guessous*, 828 F.3d at 217; *Smyth-Riding v. Sci. Eng'g Servs., LLC*, 699 F. App'x 146, 151 (4th Cir. 2017); *EEOC v. Navy Fed. Credit Union*, 424 F.3d 397, 405-06 (4th Cir. 2005).

A plaintiff must first establish that he engaged in protected activity. The Fourth Circuit has explained that, "in the context of a retaliation claim, a 'protected activity' may fall into two categories, opposition and participation." *Navy Federal Credit Union*, 424 F.3d at 406; *see Netter*, 908 F.3d at 937. "An employer may not retaliate against an employee for participating in an ongoing investigation or proceeding under Title VII, nor may the employer take adverse employment action against an employee for opposing discriminatory practices in the workplace." *Laughlin*, 149 F.3d at 259; *see* 42 U.S.C. § 2000e-3(a).

The second element is that of an "adverse action." In *Strothers*, 895 F.3d at 327, the Fourth Circuit explained that an "adverse *employment* action" is not the standard in a retaliation case.

(Emphasis added.)  In other words, the adverse action "need not be employment or workplace-related in order to sustain a retaliation claim." *Id.*  In a retaliation claim, the standard for an adverse action is more lenient than for a substantive discrimination claim.  *Burlington Northern & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 64 (2006) ("*Burlington Northern*") ("[T]he antiretaliation provision, unlike the substantive provision, is not limited to discriminatory actions that affect the terms and conditions of employment.").

In the retaliation context, an action is adverse if it might "well might have dissuaded a reasonable worker from making or supporting a charge of discrimination."  *Id.* at 68 (quotation marks and citations omitted); *see Evans*, slip op. at 17; *Hoyle v. Freightliner, LLC*, 650 F.3d 321, 337 (4th Cir. 2011).  Nonetheless, "[t]he anti-retaliation provision of Title VII does not protect against 'petty slights, minor annoyances, and simple lack of good manners.'"  *Geist v. Gill/Kardash P'ship*, 671 F. Supp. 2d 729, 738 (D. Md. 2009) (quoting *Burlington Northern*, 548 U.S. at 68).  Nor does "a personal conflict alone . . . constitute retaliation."  *Spencer v. Virginia State Univ.*, 919 F.3d 199, 208 (4th Cir. 2019).

Of import here, Title VII's "antiretaliation provision protects an individual not from all retaliation, but from retaliation that produces an injury or harm."  *Burlington Northern*, 548 U.S. at 67; *see also Ray*, 909 F.3d at 667.  The Fourth Circuit has found that "discharge, demotion, decrease in pay or benefits, loss of job title or supervisory responsibility, or reduced opportunities for promotion" constitute adverse actions.  *Boone v. Goldin*, 178 F.3d 253, 255 (4th Cir. 1999).  Reassignment of job function may also constitute an adverse action.  *Young v. Montgomery Cty.*, PX-18-2054, 2019 WL 1596992, at *4 (D. Md. Apr. 15, 2019) (citing *Burlington Indus., Inc. v. Ellerth*, 524 U.S. 742, 761-62 (1998)).  But, "[a]bsent evidence that a new position is significantly more stressful than the last, vague allegations of stress resulting from reassignment cannot support

a claim of discrimination under Title VII." *Boone*, 178 F.3d at 256. At a minimum, the plaintiff must demonstrate that "the reassignment had some significant detrimental effect on" the employee. *Id*.

To establish causation under Title VII, the plaintiff bears the burden of establishing that the alleged retaliation "would not have occurred in the absence of the alleged wrongful action or actions of the employer." *Nassar*, 570 U.S. at 360; *see also Irani v. Palmetto Health*, 767 F. App'x 399, 421 (4th Cir. 2019) (per curiam). The plaintiff may proceed either by direct evidence "or by proving that any non-retaliatory justification for the [adverse action] was pretextual." *Netter*, 908 F.3d at 938; *see Foster v. Univ. of Md. – E. Shore*, 787 F.3d 243, 249 (4th Cir. 2015).

To satisfy the third element—a causal connection between the protected activity and the adverse action—a plaintiff at trial must show that "the employer [took] the adverse employment action *because* the plaintiff engaged in a protected activity." *Dowe v. Total Action Against Poverty in Roanoke Valley*, 145 F.3d 653, 657 (4th Cir. 1998) (emphasis in original). Ordinarily, there must exist "some degree of temporal proximity to suggest a causal connection." *Constantine v. Rectors & Visitors of George Mason Univ.*, 411 F.3d 474, 501 (4th Cir. 2005). Therefore, a "'lengthy time lapse between the [defendant's] becoming aware of the protected activity and the alleged adverse . . . action'" often "'negates any inference that a causal connection exists between the two.'" *Id.* (citation omitted). And, "a lapse of as little as two months between the protected activity and an adverse employment action is 'sufficiently long so as to weaken significantly the inference of causation.'" *Clarke v. DynCorp Int'l LLC*, 962 F. Supp. 2d 781, 790 (D. Md. 2013) (quoting *King v. Rumsfeld*, 328 F.3d 145, 151 n.5 (4th Cir. 2003)). *See Price*, 380 F.3d at 213 (although period of nine to ten months between protected conduct and adverse action presented "a

very close question," trier of fact could find causal connection where defendant declined to hire plaintiff "at the first available opportunity").

Nevertheless, mere temporal proximity is not necessarily enough to create a jury issue as to causation. "'Where timing is the only basis for a claim of retaliation, and gradual adverse job actions began well before the plaintiff had ever engaged in any protected activity, an inference of retaliation does not arise.'" *Francis v. Booz, Allen & Hamilton, Inc.*, 452 F.3d 299, 309 (4th Cir. 2006) (citation omitted) (affirming summary judgment where the "actions that led to [plaintiff's] probation and termination began before her protected activity, belying the conclusion that a reasonable factfinder might find that [defendant's] activity was motivated by [plaintiff's] complaints"). And, pursuant to the Supreme Court's ruling in *Nassar*, 570 U.S. at 362, "a plaintiff making a retaliation claim under [Title VII] must establish that his or her protected activity was a but-for cause of the alleged adverse action by the employer."

In this case, plaintiff alleges that his supervisors retaliated against him on several occasions due to his filing of multiple EEO complaints. It is undisputed that plaintiff initiated contact with an EEO counselor on May 17, 2013. ECF 1-6 at 1. His participation in an ongoing EEO investigation constitutes protected activity under Title VII. *Okoli*, 648 F.3d at 223; *Laughlin*, 149 F.3d at 259.

As to plaintiff's earlier EEO complaints, the parties provide differing timelines. Defendant maintains that plaintiff previously filed four EEO complaints, the last of which was "filed in August 2011" and subsequently "was dismissed for failure to timely contact an EEO counselor." ECF 16-1 at 7. Plaintiff avers that he filed several prior EEO complaints. *See* ECF 18 at 4; ECF 18-2 at 6. And, he asserts that the first retaliatory act occurred on May 11, 2013, when he met with his supervisor, Briseno.

According to plaintiff, on that date Briseno "placed a chair in front of" plaintiff, and stated that he "was having performances issues in check[ed] baggage." ECF 1 at 7. On May 17, 2013, five days after plaintiff's meeting with Briseno, Bryant filed an EEO complaint. ECF 1-6.

However, defendant argues that "the alleged retaliatory acts are not sufficiently materially adverse to state a retaliation claim." ECF 16-1 at 2. I agree with defendant.

Plaintiff's allegations that Briseno placed a chair in front of him and provided feedback critical of his performance do not rise to the level of an adverse action. Further, Shade's request on May 26, 2013, for medical documentation concerning plaintiff's vision does not constitute an adverse action. ECF 1-7 at 10-12. As defendant observes, given that plaintiff's "job strongly relies on his vision," Shade's request was entirely appropriate. *See* ECF 16-1 at 14; *Wells v. Gates*, 336 F. App'x 378, 383 (4th Cir. 2009) (observing that the plaintiff's "request for further medical documentation was not a materially adverse employment action").

In addition, plaintiff alleges that his poor performance evaluation on his mid-year assessment of August 4, 2013, was a retaliatory response to his EEO complaint. ECF 16-2 at 9. But, as defendant observes, "negative performance reviews, without more, are not adverse actions sufficient to give rise to a retaliation claim." ECF 16-1 at 14 (citing *Jones v. Constellation Energy Projects & Servs. Grp., Inc.*, 629 F. App'x 466, 468 (4th Cir. 2015)). Indeed, a poor performance evaluation "only become[s] an adverse action 'where the employer subsequently uses [it] as a basis to detrimentally alter the terms or conditions of the recipient's employment.'" *Smith v. Vilsack*, 832 F.Supp.2d 573, 583 (D. Md. 2011) (quoting *James v. Booz-Allen & Hamilton, Inc.*, 368 F.3d 371, 377 (4th Cir. 2004)) (alteration in *Smith*). Plaintiff does not contend that his performance evaluation in any way altered his job duties or pay.

Plaintiff also asserts that TSA retaliated against him on August 5, 2013, when Brewington observed him talking to himself and asked him to relocate either to the exit lane or to the break room, or complete a leave slip and go home for the day. Defendant contends that Brewington's "suggestion to take a break from work, without detriment to his position, pay or ability to return to his post after that break," is not an adverse action. ECF 16-1 at 15. I agree.

Finally, plaintiff alleges that his supervisors retaliated against him on August 8, 2013, when they directed him to complete additional training. In contrast, defendant argues, ECF 16-1 at 15:

> "[I]t strains conception how requiring Plaintiff to participate in additional training to assist him in improving his job performance, without any demotion or decrease in his job duties or responsibilities, and without decrease in pay, could possibly be considered adverse, much less materially adverse enough to dissuade a employee [sic] from raining additional concerns or retaliation or discrimination. This is especially true where, as here, Plaintiff successfully completed the training and returned to his post without any change in the terms or conditions of his employment.

As to the events of August 8, 2013, plaintiff's argument is without merit. He has not presented any evidence to demonstrate that such events resulted in "significantly different responsibilities" or caused "a significant change in benefits." *Ray*, 909 F.3d at 667 (quotation marks and citation omitted).

### 3.      Hostile Work Environment

Plaintiff alleges that he was subjected to a hostile work environment based on the same events underlying his retaliation claim. For convenience, I will restate the incidents that plaintiff claims created a hostile work environment:

(1) On May 11, 2013, Deputy Assistant FSD Briseno allegedly threatened Bryant by placing a chair in front of him and stated that Bryant was having performance issues in checked baggage;

(2) On May 26, 2013, TSM Shade requested medical documentation related to Bryant's vision;

(3) On August 4, 2013, Bryant received critical feedback from management in his mid-year evaluation;

(4) On August 5, 2013, TSM Brewington observed Bryant humming and talking to himself and she advised him that he could go to the exit lanes or the break room or fill out a leave slip and go home for the day; and

(5) On August 8, 2013, Bryant's supervisors directed him to complete additional training.

An employer violates 42 U.S.C. § 2000e-2(a)(1) "by requiring an African-American employee to work in a racially hostile environment." *Boyer-Liberto*, 786 F.3d at 277; *see Meritor Sav. Bank, FSB v. Vinson*, 477 U.S. 57, 65-67 (1986). A hostile environment exists "[w]hen the workplace is permeated with 'discriminatory intimidation, ridicule, and insult' that is 'sufficiently severe or pervasive to alter the conditions of the victim's employment . . . .'" *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21 (1993) (citations omitted).

To establish a prima facie claim under Title VII for hostile work environment based on race, the plaintiff must show that he experienced: "'(1) unwelcome [offensive] conduct; (2) that is based on the plaintiff's . . . race; (3) which is sufficiently severe or pervasive to alter the plaintiff's conditions of employment and create an abusive work environment; and (4) which is imputable to the employer.'" *Boyer-Liberto*, 786 F.3d at 277 (quoting *Okoli v. City of Balt.*, 648 F.3d 216, 220 (4th Cir. 2011)); *see also Evans v. International Paper Co.*, ___ F.3d ___, No. 18-1448, slip op. at 11 (4th Cir. Aug. 27, 2019); *Perkins v. International Paper Co.*, ___ F.3d ___, No. 18-1507, slip op. at 11 (4th Cir. Aug. 27, 2019); *Ray*, 909 F.3d at 667; *Irani*, 767 F. App'x at 416.

Hostile work environment claims may involve "a series of days or perhaps years . . . ." *Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 115 (2002). Thus, for hostile work environment claims, "[i]t does not matter, for purposes of [Title VII], that some of the component acts of the hostile work environment fall outside the statutory time period." *Id.* at 117. "Provided

that an act contributing to the claim occurs within the filing period, the entire time period of the hostile environment may be considered by a court for the purposes of determining liability." *Id.*

To satisfy the second element of a hostile work environment claim, the plaintiff must demonstrate that he was harassed or otherwise discriminated against "because of" his protected class. *Smith v. First Union Nat. Bank*, 202 F.3d 234, 242 (4th Cir. 2000) (citing *Wrightson v. Pizza Hut of America, Inc.*, 99 F.3d 138, 142 (4th Cir. 1996)). The plaintiff may satisfy this burden by showing that, "but for" his protected class, he would not have suffered discrimination. *Id.* But, "harassment due to personality conflicts will not suffice. Some persons, for reasons wholly unrelated to [the plaintiff's protected class], manage to make themselves disliked." *Ziskie v. Mineta*, 547 F.3d 220, 226 (4th Cir. 2008)).

As to the third element of a hostile work environment claim, a hostile work environment exists under Title VII when the "'workplace [is] permeated with discriminatory intimidation, ridicule, and insult . . . .'" *Boyer-Liberto*, 786 F.3d at 281 (quoting *Jordan v. Alternative Resources Corp.*, 458 F.3d 332, 339 (4th Cir. 2006)) (some quotations and citation omitted); *see Harris*, 510 U.S. at 21; *Nnadozie v. Genesis HealthCare Corp.*, 730 F. App'x 151, 158 (4th Cir. 2018). The Fourth Circuit has stated that the plaintiff must allege that "the environment would reasonably be perceived, and is perceived, as hostile or abusive." *Boyer-Liberto*, 786 F.3d at 277 (citing *Harris*, 510 U.S. at 22).

The "severe or pervasive" requirement has both subjective and objective components. *Harris*, 510 U.S. at 21-22; *see Evans*, slip op. at 11; *E.E.O.C. v. Cent. Wholesalers, Inc.*, 573 F.3d 167, 175 (4th Cir. 2009). Thus, "[w]hether the environment is objectively hostile or abusive is 'judged from the perspective of a reasonable person in the plaintiff's position.'" *Boyer-Liberto*, 786 F.3d at 277 (quoting *Oncale v. Sundowner Offshore Servs., Inc.*, 523 U.S. 75, 81 (1998)); *see*

*Irani*, 767 F. App'x at 416; *Nnadozie*, 730 F. App'x at 158.  However, the plaintiff does not need to demonstrate that the work environment is "psychologically injurious."  *Id.  Harris*, 510 U.S. at 21-22.

Notably, "viable hostile work environment claims often involve repeated conduct. . . . because, 'in direct contrast to discrete acts, a single act of harassment may not be actionable on its own.'"  *Boyer-Liberto*, 786 F.3d at 277 (quoting *Morgan*, 536 U.S. at 115-17); *see Irani*, 767 F. App'x at 416.  But, "an 'isolated incident[]' of harassment can 'amount to discriminatory changes in the terms and conditions of employment,' if that incident is 'extremely serious.'"  *Boyer-Liberto*, 786 F.3d at 277 (alterations in original) (citation omitted).  The Court stated in *Boyer-Liberto*, *id.* at 278:  "In measuring the severity of harassing conduct, the status of the harasser may be a significant factor—e.g., a supervisor's use of [a racial epithet] impacts the work environment far more severely than use by co-equals."  (citation omitted); *see also*, *e.g.*, *E.E.O.C. v. Fairbrook Medical Clinic, P.A.*, 609 F.3d 320, 329 (4th Cir. 2010) (quoting *Ziskie*, 547 F.3d at 227) ("When evaluating the context in which harassment takes place, we have often focused on the 'disparity in power between the harasser and the victim.'"); *Jennings v. Univ. of N.C.*, 482 F.3d 686, 697 (4th Cir. 2007) (en banc) ("Any age disparity between the harasser and his victim is also relevant to gauging whether there was a hostile or abusive sexual environment.").

However, the "'[m]ere utterance of an . . .  epithet which engenders offensive feelings in an employee' does not sufficiently affect the conditions of employment to implicate Title VII."  *Boyer-Liberto*, 786 F.3d at 277 (quoting *Harris*, 510 U.S. at 21) (other citations omitted); *see Evans*, slip op. at 12.  And, "simple teasing, offhand comments, and isolated incidents (unless extremely serious) will not amount to discriminatory changes in the terms and conditions of employment."  *Faragher v. City of Boca Raton*, 524 U.S. 775, 788 (1998) (internal quotation marks

and citations omitted); *see also Evans*, slip op. at 12; *Boyer-Liberto*, 786 F.3d at 294. Similarly, "complaints premised on nothing more than 'rude treatment by [coworkers]', 'callous behavior by [one's] superiors,' or 'a routine difference of opinion and personality conflict with [one's] supervisor, are not actionable under Title VII.'" *E.E.O.C. v. Sunbelt Rentals, Inc.*, 521 F.3d 306, 315-16 (4th Cir. 2008) (internal citations omitted); *see Evans*, slip op. at 12; *Nnadozie*, 2018 WL 1830935, at *8. Indeed, Title VII does not constitute "a general civility code." *Oncale*, 523 U.S. at 80.

The determination as to "severe and pervasive" is not, and "'by its nature cannot be, a mathematically precise test.'" *Boyer-Liberto*, 786 F.3d at 277 (quoting *Harris*, 510 U.S. at 22). Moreover, "[n]o single factor is dispositive, as [t]he real social impact of workplace behavior often depends on a constellation of surrounding circumstances, expectations, and relationships which are not fully captured by a simple recitation of the words used or the physical acts performed." *Sunbelt Rentals, Inc.*, 521 F.3d at 315 (quoting *Harris*, 510 U.S. at 23, and *Oncale*, 523 U.S. at 81-82) (internal citations and quotation marks omitted). The objective determination "requires consideration of all circumstances, which 'may include the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employer's work performance.'" *Irani*, 767 F. App'x at 416 (quoting *Harris*, 510 U.S. at 23); *see Evans*, slip op. at 11; *Sunbelt Rentals, Inc.*, 521 F.3d at 315.

In this case, the circumstances do not establish harassment or a hostile work environment based on race.

As indicated, plaintiff alleges that on May 11, 2013, he met with Briseno. According to plaintiff, Briseno was "trying to pick a fight" when Briseno told plaintiff that he was having

performance issues in baggage. ECF 16-2 at 5. Plaintiff maintains that Briseno's comment was based on plaintiff's race because Briseno is "White" and plaintiff is African-American. *Id*. at 6.

In addition, on May 26, 2013, plaintiff avers that he "was targeted" based on his "race" when Shade, who is "White," requested additional medical documentation. *Id*. at 8. Plaintiff also alleges that on August 4, 2013, Nearhood gave him critical feedback during his mid-year performance evaluation because Nearhood is "White" and "she did not want [him] there when [he] first arrived." *Id*. at 9. And, plaintiff avers that on August 5, 2013, Brewington accused him of humming to himself and cursing, and she was "coming after [him] because [he is] Black[.]" *Id*. at 10. Also, plaintiff complains because on August 8, 2013, he was directed to undergo additional job training.

Plaintiff has not alleged circumstances that altered the conditions of his employment or created an abusive atmosphere, so as to give rise to a hostile environment claim. Indeed, he has not overcome "the steep requirements of a hostile work environment claim." *Evans*, slip op. at 12. As defendant observes, ECF 16-1 at 16: "Plaintiff alleged only five discrete and mundane interactions with his management, all of which concerned Plaintiff's work performance and none of which related to his race, explicitly or implicitly." Plaintiff's allegations, at most, suggest that he experienced a modicum of concern and criticism from his supervisors, but the allegations are woefully inadequate in regard to a claim that the criticism or concern was based on his race.

Even if plaintiff could establish *prima facie* claims of retaliation or hostile work environment, TSA has amply established legitimate, non-retaliatory, and non-discriminatory reasons for all of its personnel actions.

From May through August of 2013, TSA management had a genuine concern that plaintiff had a physical limitation (*i.e.*, poor eyesight), and good vision is essential to his job. As mentioned

earlier, the Aviation and Transportation Security Act lists physical requirements for TSA's security screening workforce, one of which is visual acuity. Plaintiff's supervisor learned from plaintiff himself – a screener in checked baggage whose primary responsibility is to analyze images on a screen – that his vision is occasionally "blurry." On this basis, it was justified in requiring him to obtain medical documentation reflecting that his vision is adequate to perform his job. *See* ECF 16-7. Moreover, plaintiff was directed to complete supplemental training based on documented concerns about his work performance. *See* ECF 16-6; ECF 16-8; ECF 16-11; ECF 16-15.

Plaintiff's mid-year performance review stated that plaintiff "[n]eeds improvement with OSARP protocols and procedures and image recognition." ECF 16-11. According to TSA, this comment "was legitimate, non-discriminatory, and non-retaliatory because Plaintiff did in fact need to improve his job performance in this regard." ECF 16-1 at 18. Plaintiff received additional training and, at the conclusion of that training, was noted to have demonstrated competence in this area. ECF 16-16.

In the days following plaintiff's mid-year performance evaluation, plaintiff's supervisors received reports from several of plaintiff's colleagues, advising that they were not comfortable with Bryant's behavior. ECF 16-10; ECF 16-12; ECF 16-13. In accordance with the Handbook to Management Directive 1100.73-5, ECF 16-4, plaintiff was asked to take a break from his work environment. He complied, and "nothing more came of the incident." ECF 16-1 at 19; *see also* ECF 16-14.

As defendant puts it, plaintiff "complied with management's requests, adequately completed the additional training, and continued to serve TSA in the same position without impact on any of the terms and conditions of his employment." ECF 16-1 at 18.

Plaintiff has not shown that TSA's proffered reasons were mere pretext for discrimination. Accordingly, I shall grant the Motion with respect to plaintiff's harassment claim.

## IV.    Conclusion

For the reasons stated above, the Motion (ECF 16) is GRANTED.   An Order follows, consistent with this Memorandum Opinion.


Date:   August 27, 2019                                    _____/s/_____

Ellen L. Hollander
United States District Judge